# United States Court of Appeals for the Federal Circuit

2008-5177

TYLER CONSTRUCTION GROUP,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Michael H. Payne, Payne Hackenbracht & Sullivan, of Fort Washington, Pennsylvania, argued for plaintiff-appellant.

Douglas G. Edelschick, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Michael F. Hertz, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Reginald T. Blades, Jr., Assistant Director. Of counsel on the brief were Thomas J. Warren, Office of the Chief Counsel, Army Corps of Engineers, of Washington, DC, and Charles L. Webster III, Engineer Trial Attorney, of Fort Worth, Texas.

Appealed from: United States Court of Federal Claims

Senior Judge John P. Wiese

# United States Court of Appeals for the Federal Circuit

2008-5177

TYLER CONSTRUCTION GROUP,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Appeal from the United States Court of Federal Claims in 08-CV-094, Senior Judge John P. Wiese.

_____

DECIDED:  June 25, 2009

_____

Before MAYER, FRIEDMAN, and RADER, <u>Circuit Judges</u>.

FRIEDMAN, <u>Circuit Judge</u>.

The principal issue is whether the United States Army Corps of Engineers ("the Corps") was authorized to use so-called Indefinite Deliver/Indefinite Quantity Contracts (known as "IDIQ contracts") for the design and construction of military buildings (barracks and related structures) in an eight-state area in the southeastern United States.  As the name implies, those contracts did not state the number of such structures to be built or the dates for construction, but did specify the total dollar range the construction would involve.  The Court of Federal Claims held that the Corps was authorized to use those contracts for this procurement, and we affirm.

I

A.      This litigation stems from what the Corps described, in the language of the Court of Federal Claims' opinion, as "part of a fundamental change in military construction strategy designed to transform the United States Army into a more modular, expeditionary, and effective fighting force."  Tyler Constr. Group v. United States, 83 Fed. Cl. 94, 95 (2008).  The underlying facts, as stated in that opinion, are largely undisputed.

The Corps stated that "its primary objective is to meet the Department of the Army's time, cost, quality, and standardization targets and goals while providing new facilities for our soldiers and their families—an undertaking requiring a minimum of 20% reduction in cost and a minimum of 30% reduction in time to occupancy."  Id. at 95-96 (internal quotation marks omitted).  To accomplish that objective, the Corps:

> initiated a market research program in 2005 to acquaint members of the construction industry with the Army's upcoming needs and to gain the industry's perspective on how best to execute a construction program of the magnitude contemplated.  The program included sponsorship of a nationwide forum, four regional forums, and a specialized forum with representatives of the prefabricated/pre-engineered/modular construction industry, as well as the implementation of an internet-based research questionnaire.  Through these efforts, the Corps identified an industry consensus that the successful execution of its construction program would require an emphasis on standardization and economies of scale.  Based on this conclusion, the Corps decided to pursue a flexible acquisition strategy "composed of primarily local and regional contracts with a possibility of national contracts, in order to execute an estimated $40 Billion dollar Military Construction . . . Program."

Id. at 96.

In 2007, the Corps issued a solicitation seeking proposals for the construction. The amended solicitation provided for a negotiated one-year multiple award task order contract, with two additional one-year options, a minimum $10,000 guarantee for the first year, and a total estimated contract amount of $301 million. The Corps estimated that the value of the initial task order under the contract would be between $25 million and $100 million.

The solicitation described in general terms the facilities to be constructed under the initial task order. It included a 252-page statement of work outlining in detail the other types of facilities to be built. "The statement of work does not indicate where these facilities are to be built; it does, however, inform offerors that the facilities will be required primarily at Fort Benning, Georgia."

The solicitation contemplated a two-phase proposal process in which two or more contractors would be selected. In the first phase, the Corps would evaluate the performance capabilities of the prospective contractors based on specified criteria. In the second phase, the contractors would submit proposals for the initial task order. Those to whom contracts were awarded would "become the only competitors for the negotiation and award of all subsequent task orders, subject only to the limitation that a contractor is not . . . obligated to honor a task order of less than $14 million, a task order in excess of $47.5 million, or any order involving a combination of items in excess of $95 million." Id. at 96

B. The appellant, Tyler Construction Group ("Tyler"), which described itself in its complaint as "a small business general contractor," did not submit any proposal in response to the solicitation. Instead, it filed the present suit in the Court of Federal

Claims seeking injunctive and declaratory relief against the solicitation. It challenged the Corps' use of IDIQ contracts for this procurement on various grounds, including the claims that such use was not authorized by the Federal Acquisition Regulation ("FAR") and that it violated statutory and regulatory provisions that favor and protect small businesses.

On the parties' cross-motions for judgment on the administrative record, the Court of Federal Claims granted the government's motion and dismissed the suit. Tyler Constr. Group, 83 Fed. Cl. at 95. After that decision, the Corps selected three firms to whom it awarded contracts.

The court rejected Tyler's contention that the FAR does not authorize the use of IDIQ contracts for a major construction project. Tyler stated that such contracts "have historically been used for the procurement of essentially identical 'supplies or services' for which there is a recurring need at a single installation or within a small geographic area." Tyler argued that FAR § 16.501-2(a), 48 C.F.R. § 16.501-2(a), "which identifies an IDIQ contract as a contract used 'to acquire supplies and/or services when the exact times and/or exact quantities of future deliveries are not known at the time of contract award,'" does not cover "construction" because the latter is not a "service." It pointed to other provisions of the FAR that parenthetically inserted, after "goods and services," the term "(including construction)." The government countered by citing still other FAR provisions that stated, after "goods and services," "(excluding construction)."

Noting that there is "no law, statute, or regulation that prohibits the use of an IDIQ contract for the procurement of construction services," the Court of Federal Claims concluded that "the various provisions of the FAR offer little insight into whether

'construction' is included in or excluded from 'supplies or services.'" Tyler Constr. Group., 83 Fed. Cl. at 99. The court ruled that

> FAR § 1.102(d)—providing procurement officials with the authority to use innovative approaches to satisfy the government's procurement needs so long as such approaches are not otherwise addressed in the FAR or prohibited by law—governs the instant procurement. We find that the solicitation represents the sort of innovation envisioned by that section and, with its identification of both a contract dollar value and a general scope of work, constitutes a permissible exercise of IDIQ contracting authority.

Id.

The Court of Federal Claims also rejected Tyler's alternative contention that "the scope of the solicitation, as measured by both its dollar amount and the geographic distribution of its construction work, is of a magnitude that impermissibly forecloses small business participation." Id. at 100 (footnote omitted). Tyler relied on the anti-bundling provision of the Small Business Act, 15 U.S.C. § 631(j)(3), which requires "each Federal agency" to "avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors," and the similar limitation on "consolidation" of procurement in 10 U.S.C. § 2382(a). The court stated: "In plaintiff's view, the Corps' use of a single procurement to acquire the design and construction of multiple facilities, many of which would have been suitable for small-business contractors, constitutes the improper bundling the statute prohibits and should be enjoined on that ground." Tyler Constr. Group, 83 Fed. Cl. at 100.

In rejecting this contention, the court relied on 15 U.S.C. § 644(e)(2)(A), which provides:

Before proceeding with an acquisition strategy that could lead to a contract containing consolidated procurement requirements, the head of an agency shall conduct market research to determine whether consolidation of the requirements is necessary and justified.

The court

conclude[d] . . . that the Corps has demonstrated that the consolidation of the contract requirements was necessary and justified within the meaning of the relevant statutes. [T]he Corps' choice of acquisition strategy was dictated by an industry consensus that successfully meeting the Army's goals in construction costs and time would require a departure from the Corps' traditional "one project at a time" approach in favor of an acquisition strategy that maximized economies of scale. Given the Corps' extensive market research and its detailed analysis of the issue, we can find no fault with the Corps' decision to rely on the industry's counsel.

Tyler Constr. Group, 83 Fed. Cl. at 103.

II

The FAR provisions relating to IDIQ contracts (there called "indefinite delivery contracts") state that such contracts "may be used to acquire supplies and/or services when the exact times and/or exact quantities of future deliveries are not known at the time of contract award." FAR § 16.501-2(a), 48 C.F.R.. § 16.501-2(a). FAR § 16.504(a)(1), 48 C.F.R. § 16.504(a)(1) provides that "[t]he contract must require the Government to order and the contractor to furnish at least a stated minimum quantity of supplies or services." The FAR provides that contracting officers "may use" such contracts "when the Government cannot predetermine, above a specified minimum, the precise quantities of supplies or services that the Government will require during the contract period." Id. § 16.504(b). Other provisions of that section also refer to "supplies

or services" the contractor will furnish or the government will acquire.  Id. § 16.504(a)(1), (a)(4)(iii).

Tyler contends that under these provisions IDIQ contracts cannot be used for large scale building construction because "services" as there used does not include "construction."  As previously noted, each party seeks to support its position by citing other provisions of the FAR, some of which state "(including construction)" after "supplies or services" and others of which state "(excluding construction)" after that phrase.  We agree with the Court of Federal Claims that these provisions of the FAR "offer little insight into whether 'construction' is included in or excluded from 'supplies or services.'"  Tyler Constr. Group, 83 Fed. Cl. at 99.  All that they show is that, depending on the context, "services" may or may not include "construction."  They do not establish, as Tyler contends, that in determining whether IDIQ contracts may be used for major military building projects, "services" does not include "construction."

Like the Court of Federal Claims, we conclude that the proper inquiry is not whether the FAR authorizes the use of IDIQ contracts for a procurement of construction, but whether there is any statutory or regulatory provision that precludes such use.  Again, like that court, we are unaware of any such provision, and Tyler has not pointed to any.  Indeed, it appears that Tyler does not challenge that conclusion.

The reason that this is the appropriate inquiry is explained in FAR § 1.102(d), 48 C.F.R. § 1.102(d), which states:

> The role of each member of the Acquisition Team is to exercise personal initiative and sound business judgment in providing the best value product or service to meet the customer's needs.  In exercising initiative, Government members of the Acquisition Team may assume if a specific strategy, practice, policy or procedure is in the best interests

of the Government and is not addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation, that the strategy, practice, policy or procedure is a permissible exercise of authority.

In other words, government officers are authorized, indeed, encouraged, in exercising personal initiative in procurement matters, to assume that "a specific strategy, practice, policy or procedure" that is not "addressed in the FAR nor prohibited by law (statute or case law), Executive order or other regulation" and that "is in the best interests of the Government," "is a permissible exercise of authority."

We agree with the Court of Federal Claims that the Corps' use of IDIQ contracts to effect this procurement of military housing "represents the sort of innovation envisioned by that section and, with its identification of both a contract dollar value and a general scope of work, constitutes a permissible exercise of IDIQ contracting authority." Tyler Constr. Group, 83 Fed. Cl. at 99.

The Corps was faced with an unusually large and novel procurement that had to meet the Army's unusual and demanding standards and requirements. The Army was seeking what the Corps viewed as "a fundamental change in military construction strategy designed" to make the Army "a more modular expeditionary and effective fighting force." Tyler Constr. Group., 83 Fed. Cl. at 95. The Army's new approach to housing construction required a 20% reduction in cost and a 30% reduction in the time required until the facilities could be occupied.

Prior to deciding to use IDIQ contracts for this procurement, the Corps carefully studied, analyzed and evaluated the situation. It conducted a research program which included a nationwide forum, four regional fora, and "a specialized forum with representatives of the pre-fabricated/pre-engineered/modular construction industry, as

well as the implementation of an internet-based research questionnaire." Tyler Constr. Group, 83 Fed. Cl. at 96. The Corps concluded that there was "an industry consensus that the successful execution of its construction program would require an emphasis on standardization and economies of scale. Based on this conclusion, the Corps decided to pursue a flexible acquisition strategy 'composed of primarily local and regional contracts with a possibility of national contracts, in order to execute an estimated $40 Billion dollar Military Construction . . . Program.'" Id.

The Corps, like other federal procurement entities, has broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation. Cf. E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996) (in negotiated contracts "[p]rocurement officials have substantial discretion to determine which proposal represents the best value for the government"); Lockheed Missiles & Space Co. v. Bentsen, 4 F.3d 955, 958 (Fed. Cir. 1993) ("Effective contracting demands broad discretion."). The Corps did not abuse that discretion in concluding that in the situation here, the use of IDIQ contracts to obtain this large military construction was the most appropriate method of proceeding and therefore best served the interests of the United States. Nor did the Corps violate or ignore any statutory or regulatory requirements, prohibitions or standards in so acting.

III

A. Tyler also contends that in using this type of procurement, the Corps violated statutory and regulatory provisions designed to aid and protect small businesses and to insure that they receive a fair and adequate share of government contracts and business. It relies primarily on the anti-bundling provision of the Small Business Act,

which in pertinent part requires "each Federal [acquiring] agency" to "avoid unnecessary and unjustified bundling of contracts requirements that precludes small business participation in procurements as prime contractors." 15 U.S.C. § 631(j)(3). According to Tyler, the Corps' combination (or "bundling") of procurement of military facilities under a single contract resulted in a procurement whose dollar amount was beyond the financial capacity of small business firms, who could and would have competed for constituent individual components of smaller size.

The government seeks to avoid this limitation on its contracting authority by arguing that this statutory provision does not apply to new construction. It relies on statutory provisions that state that "[t]he term 'bundling of contract requirements' means consolidating 2 or more procurement requirements for goods or services previously provided or performed under separate smaller contracts," 15 U.S.C. § 632(o)(2), and that "[t]he terms 'consolidation of contract requirements' and 'consolidation' . . . mean a use of a solicitation to obtain offers for a single contract or multiple award contract to satisfy two or more requirements . . . for goods or services that have previously been provided . . . under two or more separate contracts smaller in cost." 10 U.S.C. § 2382(c)(1). According to the government, under these definitions the bundling and consolidation statutes "apply only to contracts that would combine existing requirements, previously provided, under separate smaller contracts," but "do not apply to new construction, which is a new requirement."

Like the Court of Federal Claims, we need not decide this question because we conclude that even if those provisions cover new construction, the Corps' conduct of this procurement did not violate them.

The statute does not prohibit all bundling of contract requirements, but only "unnecessary and unjustified bundling." Light on the meaning of this language is provided by 15 U.S.C. § 644(e)(2)(A), which states

> Before proceeding with an acquisition strategy that could lead to a contract containing consolidated procurement requirements, the head of an agency shall conduct market research to determine whether consolidation of the requirements is necessary and justified.

As we have noted, the Corps conducted extensive market research before determining that consolidation of the procurement requirements was "necessary and justified." We agree with the Court of Federal Claims

> that the Corps has demonstrated that the consolidation of the contract requirements was necessary and justified within the meaning of the relevant statutes . . . the Corps' choice of acquisition strategy was dictated by an industry consensus that successfully meeting the Army's goals in construction costs and time would require a departure from the Corps' traditional "one project at a time" approach in favor of an acquisition strategy that maximized economies of scale. Given the Corps' extensive market research and its detailed analysis of the issue, we can find no fault with the Corps' decision to rely on the industry's counsel.

Tyler Constr. Group, 83 Fed. Cl. at 103.

B. Tyler makes an alternative argument challenging the combination or bundling of these procurements, based on the requirements of the Small Business Competitiveness Demonstration Program Act of 1988, 15 U.S.C. § 644 note, that relate to set-asides of government contracts for small business. The Court of Federal Claims stated:

> "As explained in the Act's introductory findings, traditional efforts to implement the mandate for small business participation in federal procurements have resulted in an over-concentration of small business participation in a limited

number of industry categories, while at the same time failing to expand small business participation in certain other categories. 15 U.S.C. § 644 note, §§ 702(3)(A), (B). FAR § 19.1007(b), the regulation implementing the Act, thus prohibits solicitations in certain designated contract categories from being subject to small business set-asides, except for those set-asides mandated for socially and economically disadvantaged small businesses. 15 U.S.C. § 644 note, §§ 713(a), 717(a), (b), 718(a)."

Tyler Constr. Group, 83 Fed. Cl. at 103 n.9.

Tyler concedes that it is not such a disadvantaged small business and that the statute would prohibit the Corps from awarding it a contract under a small business set-aside. It argues, however, that because the Army had not met its total small business set-aside requirement for the year involved, the Corps on its own should have requested the Department of Defense to waive the foregoing statutory limitation on set-asides for non-disadvantaged small businesses. It contends that the Corps' failure to seek such a waiver constituted an abuse of discretion.

Tyler does not state that it requested the Corps to seek such a waiver, that the Department of Defense had any administrative procedure for doing so, or that if a waiver had been sought it likely would have been granted. Nor is it clear exactly what precise waiver was sought. Since Tyler contends that the combination of the individual construction projects produced a contract whose dollar amount exceeded the financial capacity of small businesses, it would not have aided Tyler if the entire contract project had been set aside for small business: The contract still would have been beyond Tyler's financial capacity. What Tyler must have sought, therefore, was the breaking down of this large contract into its component parts and separate procurements for each part, for which Tyler would have had the financial capacity to compete.

Seeking such a waiver would have been inconsistent with the Corps' determination that the consolidation of procurement it undertook was "necessary and justified." The Corps did not abuse its discretion in failing sua sponte to seek a waiver of that statutory limitation, which would have undone that determination.

C. In evaluating Tyler's contention that the Corps' handling of this procurement was inconsistent with, if not contrary to, the statutory and regulatory provisions involving the federal commitment to aiding small business participation in government procurement, it is important to consider the Corps' action here in helping small businesses to participate in this procurement.

In its "National Acquisitional Strategy" plan for this major military construction, the Corps directed that regional acquisition plans "must strike a balance between achieving economies of scale and meeting small business and other social-economic goals, as well as small-business considerations when unrestricted acquisitions are necessary." The Acquisition Plan that covered this procurement provided that 20 percent of the contract dollars be set aside for small business, including 100 percent of the dollar amount for certain types of facilities and for projects valued at less than $15 million. The solicitation in the present case provided that: "All offerors (both large and small businesses) will be evaluated on the level of small business commitment they demonstrate for the proposed acquisition, and their prior level of commitment to utilizing small businesses in performance of prior contracts." The Corps established "reasonable and achievable" subcontracting goals for the utilization of small businesses, including a goal that 70 percent of subcontracted work should be performed by small

business.  Firms could associate together as teams or joint ventures when submitting proposals.

The Corps endeavored, as far as practicable, to comply with the statutory and regulatory requirements and policies for small business participation in government procurement.  It cannot properly be faulted for failing to do so because it did comply.

D.  We have considered Tyler's other contentions, but they are unconvincing. They do not require separate discussion.

CONCLUSION

The judgment of the Court of Federal Claims is

AFFIRMED.